When you're ready, Mr. McCormick. Thank you, Your Honor. May it please the Court, for the record, I'm Steve McCormick on behalf of the appellant and Cross-Epilee Honeywell. Unless the Court has other ideas, I intend to focus in the few minutes that I have in my initial presentation to you on two of the claim construction issues of the five that we've presented to Your Honors. Those two having led to the summary judgment opinion of non-infringement. Well, how were the other three before us if they didn't lead to the summary judgment? They're before you, Your Honor, because there was an opinion, an order granted, an order entered, which we believe was erroneous. We've appealed that order, so jurisdictionally it's not an appealable order. You can only appeal a judgment. The judgment rests on two claim constructions, not five, right? Well, it rests on two claim constructions, not five. But I believe, Your Honor, that the order, once there was a final judgment, the order of that court is appealable. And let me suggest to you that we don't want to go back down to the district court with incorrect claim constructions. But let me come back to the two, because where the rubber hits the road, really, on our appeal, is look-ahead distance and terrain floor boundary. They led to the summary judgment that was granted of non-infringement. Let me start with look-ahead distance. I don't believe you could read this claim and this patent as a person skilled in the art or not skilled in the art and not understand that look-ahead distance simply meant exactly what the words say. It's the distance ahead that the system looks. The only limitation in the claim that's at issue in this case on the look-ahead distance is not a limitation on its definition but how it's computed, how it's determined. The only limitation is that that look-ahead distance is a function of speed, that is, the speed of the aircraft. That is, it's not a fixed distance. It varies with speed. But how do you determine distance without calculating time also with speed? You can't. So it has to be a function of both, right? Pardon? It has to be a function of both, speed and time. It absolutely has to be a function of both. Time is inherent in the calculation, but, of course, you do not have to recite every element in your claim that's necessary to practice the invention. And, Your Honor, let me focus on this. Time is inherent but not some particular length of time. What the court did was to go back to the descriptive part of the specification and say, I'm going to impose the added limitation that it must be a function of speed of the aircraft and time to complete an evasive maneuver. We believe that that was incorrect. Time is inherent but not some particular portion of time. But let's, in the interest of time, accept that for the moment. That doesn't get to summary judgment because neither of these defendants has in any court and will not today stand up and say, our system doesn't provide time to complete an evasive maneuver. And there's an abundant record that that's exactly what their look-ahead distance is designed to do. So how did we get to summary judgment? We got to summary judgment because after the court construed look-ahead distance to include time to complete an evasive maneuver, when the court got to summary judgment, the court did not compare those devices to that term. The court compared those devices to figure five of the patent. This is the record at A255. Figure five shows an example of how, using a three-step process, example of how the look-ahead distance could be computed. It's not even an embodiment. It's just an example of how the calculation could be done. And the court recited that, and this is at the summary judgment opinion at Appendix 118, that they didn't have this particular method of computing the look-ahead distance. And we don't believe, with due respect to the district court, that anyone could read this patent, skilled or unskilled in the art, and think that's what was invented. There's no time element at all in the claim. First, the court adds time to complete an evasive maneuver. And then incorporates all of the specifics from figure five. And this court has spoken too many times to account that that is not a proper way to approach claim construction in this case. If I could, unless there's others on look-ahead distance, let me speak briefly about terrain, floor, boundary. Larry, your problem is that in the specification there, to be sure, it's in the description of the preferred embodiment. There does seem to be language that could be viewed as a definition of terrain, floor, boundary in relating that to the distance to the closest airport, correct? Correct. In Column 10, in fact, in Column 10, it uses the term proportional keyword to the closest keyword runway. Let me suggest to Your Honor that I can demonstrate that is not an express definition of terrain, floor, boundary. When you're landing, is the closest runway going to be something other than the landing runway? Destination runway, which is how Universal says it. It sounds a little strange that there's going to be a closer runway when you're 10 feet off the ground. Universal says we don't do it because we don't use the closest runway. Well, obviously, the destination runway becomes the closest runway. But let me come back to the language. Column 10 indeed uses the language that you suggest, Your Honor, proportional to the closest. But if you look at Column 10 of the patent, Column 10, and this is the record at Appendix 285, Column 10 in that language says the terrain, floor relates to a distance delta H. Now, again, delta H is a dimension in Figure 6 of the patent. If you look at Figure 6, there is the dimension delta H. That's the vertical dimension of the terrain, floor, boundary. That makes it, I believe, clear that what's here is not an express definition. It's a description of this embodiment. And the patent makes that even more clear. If you look over on Column 11, it says, referring to the same delta H, it says, as mentioned above, the delta H, this is at Column 11, Line 17 or 18, the delta H terrain, floor, boundary is a function of the distance from the runway. A function, not proportional. Now, is proportional and function the same? Perhaps it is. But proportional, a function of a distance to the runway. Now, Your Honors, let me suggest once again, we think that claim construction was wrong. I think I've just shown you that this description is much broader. But even if you accepted it, the fact is both of these devices have a terrain, floor, boundary that is proportional to the nearest runway. Your Honors already identified why in the case of Universal it is. In addition to that, as we laid out in our brief, in the Universal device, it's destination runway that counts while it's on the flight plan. But you can't have a CFIT accident on your flight plan. You have a CFIT accident when the plane gets off its flight plan. And as our brief pointed out and the evidence of trial pointed out, at that point it immediately reverts to closest runway. With Sandell, Sandell doesn't dispute closest runway. Sandell says we are not proportional because proportional, they're going to read, of course, as the district court eventually did, proportional to mean something different from function, to mean direct proportionality or linear proportionality. Sandell says we don't just take into account distance. We take into account altitude, which is just another form of distance, of course. And therefore, and this is at their brief, at Red Brief at 51, we don't have, ours doesn't vary based on, quote, a simple distance calculation. Well, the patent doesn't call for a simple distance calculation. If you look at Figure 6, which is an example of the preferred embodiment, it shows a step down. It's generally a function of distance. Generally, as you're getting closer, that terrain floor boundary is coming up from under you and that plane is getting less protection. It's not linear. And if you'll look at the district court's summary judgment opinion, this is the core of the mistake the district court made with due respect. Summary judgment opinion, this is at the appendix of A121. The court, when it gets to summary judgment, says, well, that's not, quote, directly proportional. And with due respect, that is not how this claim was construed by the district court, however wrongly, and certainly is not how it ought to be construed by this court. We're into your rebuttal time, Mr. McCormick. Let me ask you one more question, if I could. Just briefly, tell me how I learned from Figure 6 that your construction is correct. I have more, but I'm not going to take the time to go get it done. Figure 6 shows an example of the terrain floor boundary. Can you return to the microphone? Apologize. Thank you. Figure 6 shows an example of the terrain floor boundary stepping down as the plane is getting closer from the right side of the page to the left side of the page to the airport. It shows that it's a function of distance, but it's not a direct proportion. In other words, every single segment that it's traveling, that terrain floor boundary is not changing. You see, it's a step up. So Figure 6 doesn't tell you which runway, but in your view it tells you? This goes to the proportionality issue. I see. Okay. Thank you. Thank you, Mr. McCormick. Mr. Pollack. May it please the court. Welcome back to the court. Thank you, Your Honor. For the record, my name is Howard Pollack of Fish and Richardson, representing Sandell Avionics. Just a couple brief points on the claim construction issues, and then I'd like to turn to the cross appeal. With regard to the terrain floor boundary, it seems that what counsel is arguing at this point is a new factual argument with regard to what proportional means in the court's claim construction. What difference does this make? The landing runway is going to be the closest runway in every imaginable instance, particularly if you're on the flight path. If you're off the flight path, then the game is a different game. Well, actually. So in other words, even given your claim construction, don't you infringe? No, Your Honor. The issue of proportionality, closest runway in some instances is not in fact the landing runway at certain airports, until you're practically touched down. But the key point here is whether or not it was proportional. The function in the actual system is proportional to that distance to the closest runway. There's substantial evidence in the record from both Sandell's technical expert and the designer of the system that in fact the function is not proportional to the closest runway because of the way it's calculated. In fact, in certain situations, you can have two different values for the same distance. If that's the case, it cannot be proportional. The district court credited that testimony and found, as a matter of fact, that the system did not have a calculation that was proportional, and we believe there's substantial evidence to support that finding. And I believe, in fact, that the argument being raised here is, again, although it's stated to be, well, we're accepting the limitation, in fact it's trying to erase that limitation given the facts as they were found. On the look-ahead distance... But isn't the relevant boundary, though, the function of the distance to the runway? The relevant boundary is, in fact, as defined by Honeywell in its specification, proportional to the distance to the closest runway. That's the way the specification recites it, and in fact, during prosecution, Honeywell changed the language to use this term of art that they coined, terrain-floor boundary, to avoid the prior art, and also in the foreign prosecution, they specifically stated and admitted that the specification defines, quote-unquote, terrain-floor boundary as the distance proportional to... We're trying to prevent nuisance warnings. We just don't want the thing to go off on terrain warnings when you're landing. That's going to work in both of these systems. I mean... The goal of the system, of course, is to prevent CFIT accidents and to do so in a way that... Yeah, but this particular claim element is to prevent nuisance warnings. That's, in fact, part of the proportional sentence, to the closest airport, to prevent nuisance warnings. That's correct. If we include that part of the definition, don't you have a different outcome? No. If you do it differently, you can still prevent nuisance warnings using a different mechanism, and that's what this report found. No, aren't you within the claim term? The claim term just says terrain boundary. Terrain-floor boundary is what the claim term says, and as a matter of fact... Terrain-floor boundary, when you're doing the same thing to prevent nuisance warnings. It sounds like you're actually arguing doctrine of equivalence, not liberal. No, we're talking claim construction. The claim construction is what the specification defines and what was defined. We believe the district court followed the rules of claim construction to the letter. You look at the claim language. You look at the specification. You look at the file history. But you don't read any limitations out of that specification, right? If the patentee acts as their own lexicographer, the court has got to apply the definition the patentee applied. There was no dispute that this is not a term of art. And their definition is to prevent nuisance warnings closest boundary, which is going to be the landing runway in every instance when you're going down. I'm struggling to understand your very... With all due respect, we believe that the language proportional is still there in that same language. And they chose to use a proportional terrain-floor boundary, not something else. Your system uses the destination runway, right? Actually, our system uses a blended distance based on several different runways at the airport, averaging the distance between those different runways. At the destination airport. At the destination airport, yes. Right. It's a blended distance. Plus a calculation involving altitude and vertical speed, all of which the district court found in the evidence supported was not a proportional, a boundary that was proportional to the distance to the closest runway. Since I'm... I'd like to press on to the cross-appeal because I actually believe that it's a much more interesting and problematic issue before this court. On the cross-appeal, did the district court in treating the on-sale bar and public use issues in any respect apply the wrong law? I believe that the district court misapprehended the law and improperly applied it. The cases that the court reviewed are definitely the cases that relate to the issue of... Well, in what respect did the district court apply the wrong law? I believe that the district court expanded what has been said by this court, a very narrow exception to the experimental use negation. In a couple of cases, the EZDOT case and the Manville case, and I would commend this court to the more recent case that came out after our briefs were filed, which is the Electromotive Division of General Motors versus General Electric at 417 Fed Third 1203, where this court explained that the experimental use negation is limited and it can be applied sufficient to negate a pre-critical date public use or commercial sale to cases where the testing was performed to perfect the claim features. One of the features is device for alerting a pilot. Now, how are you going to know if you're alerting a pilot unless you test it with lots of pilots and make sure you are communicating with them and alerting them? I understand that's in the preamble, but I think that's a pretty critical part of the invention. If you'd allow me, the Electromotive case goes on to say that in cases like the case there and EZDOT and Manville where a field test was needed to verify durability, that's the only limited cases where a court has been allowed to inherently find limitations that are not expressed. This is an expressed part of the claim. It's in the preamble, but I think it gives life to the whole claim. You've got to alert the pilot. Now, how do you know if you're adequately alerting pilots without running a lot of tests to make sure they're getting the message? That's why this case is very instructive because it distinguishes between the necessity for field testing, i.e., that it is necessary for the patentee to have the invention used in the public or to sell it, in order to meaningfully test those limitations that are inherent in the patent claims. And, in fact, in that case it found that the field testing was not necessary because GM could test adequately in-house. In its in-house testing, it had tested adequately in-house to prove the durability of that patented invention. But they didn't do that here. Yes, in fact, they did, Your Honor. The in-house testing- Wait a second. We have a conflict in testimony, right? We had a bench trial. We had findings. And the question was whether this testing served the purpose of making sure that the invention would perform its intended use, right? With all due respect- And there was testimony and documentary evidence both ways, and the district court made a finding. So you have a problem, it strikes me, that you're really attacking his factual findings rather than the legal standard that he applied. No. In fact, I disagree because the evidence relied upon was all based on the subjective belief, the subjective belief of the inventors that they did not believe that their system was yet ready, quote, unquote. Their system was ready for commercialization or for FAA certification. That is not what the law says. The test has got to be objectively applied. There was objective evidence based on- We have another line of cases that says it has to work in its intended environment. Yes. We've got the intended environment of pilots who speak different languages, pilots with different comprehension speeds and levels. Why wouldn't all of that factor into your actual testing to make sure it works with alerting pilots? Where is that intended environment recited in the patent? Where is it discussed anywhere? Where- We're talking about aviation. Isn't this pretty clear to one of skill in the art? No. In fact, that's not true. One of skill in the art wouldn't know that you've got pilots of different reaction times and language capabilities? What one of ordinary skill would know is that the system as described was something that was intended to improve over the prior art. That was clearly shown in the evidence before this court. There's a videotape demonstration showing actual flight on an actual plane. The district court found that there's no limitation in the claim. It's not even discussed in the patent what kind of aircraft to apply. The problem with this case is that- Was there any testimony by anybody that as of the critical date you could take this invention and install it in an aircraft and use it for its intended purpose? That evidence is shown objectively. There was testimony from Sandell's expert that the evidence of the videotape and the software that the court had in front of it showed that the invention worked for its intended purpose in an airplane flying against actual terrain. And, in fact, solved the CFIT problems that prompted the institution of the research and development that led to- And there was testimony to the contrary, right? Yes, there was testimony to that effect. And there was testimony to the contrary? No. The testimony to the contrary was that the inventors did not believe that their system was yet ready. Well, why isn't that sufficient testimony for the district court to reach a conclusion that the testing was to make sure that it would work for its intended purpose? Because this court has said repeatedly that it's an objective test and that the subjective belief of the inventors that they needed to experiment is entitled to minimum and, in fact, almost no weight. Because all inventors will come up with reasons that they need to continue to experiment. The fundamental problem that this court faces with this result is that it provides no guidance to district courts or to patentees as to what is going to be considered an inherent limitation, not recited. Objectively, nobody says that any of these limitations were recited expressly in the claims. And in what circumstances should this court expand the experimental use negation? Is it a safety system? Well, if so, how do you apply that? Is it something beyond important inventions? Mr. Pollack, do you want to give some time to Mr. Bornstein? Yes, I do, Your Honor. I believe that it's an intractable problem. Excuse me. I think Judge Gallarza has a question. With respect to the proposed sale to Gulfstream, what does that stand with regard to the sale? That's possibly one of the issues that you haven't raised yet. Yes. We believe that there's an actual contract for sale. Is that a deliverable? It's got commercial terms for delivery during, in fact, before the critical date. And, in fact, the point that the judge below relied on was she believed that it was for an experimental purpose. In fact, the contract said if it works, right, leaving open the point that they have still some experimenting to do to make sure it works. And another clause says if it doesn't, we'll sell you the look-down technology. But, Your Honor, if you look at this discussed in the briefs, the objective facts are there was never any experimentation pursuant to that contract. And, in fact, the inventor said that they believed it was ready before they installed the first unit on a Gulfstream. How could it possibly have been for experimental purposes if, in fact, there was no experimentation? I believe you can't even apply the standards set forth in the experimental use cases. There was no testing on Gulfstream. How could it have been for experimental purposes? It was clearly a commercial sale. Thank you, Mr. Pollack. Mr. Bornstein, your time is a bit limited. Good morning, Your Honors. I understand my time is brief, and so I'm going to get to the point quickly. I'd like to just briefly address a point that Judge Gagarsa mentioned a moment ago with respect to whether or not the Gulfstream sale was, in fact, a commercial offer for sale. What the evidence demonstrated was that 108 ship sets of EGPWS was offered to Gulfstream for $3.23 million in February of 1994, approximately five months before the critical date. Your Honor asked a question with respect to whether or not the product was deliverable and whether or not the product was actually in their possession at the time. According to a February 4, 1994 management volume that was authored by Honeywell, a very extensive document that was descriptive of the EGPWS that existed at the time it was offered to Gulfstream, Honeywell indicated, quote, this product offers the latest and best GPWS solution available today. That's at A5927. Subsequent correspondence after the critical date, but referencing back those Gulfstream sales, indicated that the first sale of this system, EGPWS, was made in 1994 for installation in a newly developed business jet. You'll see that at the appendix at A7106 to 7107. I'd like to briefly address the comments that were made by Mr. McCormick with respect to the claim construction analysis. Your time's expired. We'll give you another two minutes and give additional time to Mr. McCormick to compensate as well. Thank you, Your Honor. I appreciate it. You have another two minutes. Thank you. Very briefly, Mr. McCormick indicated that a person of skill in the art that looked at look-ahead distance would not understand what it means. Excuse me, any person of skill in the art that looked at look-ahead distance would, in fact, understand what it meant. The district court had the exact opposite conclusion and noted at page A40 that Honeywell presented no evidence of a common understanding of look-ahead distance at the operative time. With respect to terrain floor boundary, Mr. Pollack mentioned it. As a matter of look-ahead distance, both of these have evasion time built in, right? That's not correct, Your Honor. The fact of the matter is the way Universal's system It's not correct? What's incorrect about that? Let me explain, Your Honor. Yeah. The way that Universal's TALS system works is fundamentally different than the way that the claimed invention is described. Well, you put a 60-second automatic time in, and they figure the evasion time as a function of speed, which also includes a time factor, as Judge Gallarza pointed out. What's the difference? Your Honor, the end result may and, in fact, should be the same. In other words, you should have avoided collision. They're both evasion times, and they're both computed as a function of time. So tell me what Judge Rader, the reason why I respectfully disagree with your analysis is because we do it in a substantially different way. The way TALS works is it's based on a prefixed set value, 60 seconds for a caution, 30 seconds for a warning. The actual values, the forward extent of Universal's envelope does not vary whatsoever based on any criteria of the aircraft, any ability to turn, any pilot reaction time, which is specifically how the look-ahead distance was defined in the specification of the 080 patent. Your Honor, I understand my time is limited, if not completely over. May I just very briefly You've got 10 seconds. Okay, Your Honor, with respect to the public use, which Mr. Pollack did not have a chance to address, there are striking similarities between the Harrington case that this Court addressed and the Fred George demonstration. Both involved public use to reporters that were knowledgeable in that particular industry, commercial indications of the actual commercial price that were published in the actual publications, and I respectfully submit that public use facts support defining public use. Thank you, Mr. Bornstein. Thank you for the extra time. Sure. Would you give Mr. McCormick an extra two minutes so we can balance this out? Mr. McCormick, you have a little over six minutes. Thank you, Your Honor. Let me just say very briefly on claim construction summary judgment, unless the Court has any other questions on that, I just want to make one point. You heard Mr. Pollack say on the proportionality issue. They do take into account the distance. As they get closer to the airport, they generally do lower that distance. What Mr. Pollack said, and this will be reflected in the record, that the Court, quote, found as a matter of fact that that was not a directly proportional relationship, and I suggest to you with all due respect to district court, that is not what the district court was supposed to be doing on summary judgment. There was a dispute, clear dispute in the record, as to whether, even if you accept proportional, whether that's proportional. That should not have been reviewed as a matter of fact. Let me turn to the claim to the on-sale bar issues, unless there's any other questions on the first part of the argument. And let me begin with the sale to Gulfstream, because every word you heard in the argument this morning and virtually every word in the briefing by the defendants goes to the question across appellants, goes to the question of the second prong of FAF, whether it was ready for patenting. The fact is that the first prong of FAF presents the absolutely fundamental proposition as to whether the sale or offer for sale was of the invention. And it was a central feature of the trial in this case. Seven days of testimony, massive document submission, substantial post-trial briefing. I'll just read you, if I can, one sentence from the district court's finding. This is the appendix at 161. The court found that the offers to Gulfstream, Collins, and predecessor Honeywell reflected an early conception of EGPWS, which did not embody the claimed inventions. The offers... But what about the public use? I mean, that would seem to be harder for you. That's right. Public use. The court found that the demonstration flights, and these were the demonstration flights that took place both before and after the critical date. And again, this is from the appendix at 181. Were primarily experimental, quote, as evidenced by the use of feedback. So the sole question there is experimental use. Absolutely. Okay. And if you said to me, and there's a very substantial record, Your Honor, I'm not going to belabor it. It's the district court's opinion at appendix 189. But if you said to me, okay, you know, you've got a short time. Give me your best shot. Let me just suggest this. You kept hearing in their briefs about how there were dozens of people who made these demonstration flights. Dozens before the critical date. In round numbers, how many of those people came to this trial? How many did they find to come to this trial in person or by deposition to say, we thought they were trying to sell us the system? Zero. Not a human being ever testified that these flights were commercial in nature. Indeed, the district court found in the appendix at 188, 89, in her opinion on the merits, no Honeywell marketing direction. The fact that they're not commercial doesn't make them experimental. That's correct. She found that they were, again, primarily experimental, quote, as evidenced by the use of feedback to determine whether the inventions would accomplish their intended purpose. There's a substantial record on this, Your Honor. Weekly engineering R&D meetings reflecting feedback from those flights. The basic point is you're working on the algorithms, right? Absolutely, Your Honor. And claimed features of this invention. They're related to the claimed features, even though the algorithms themselves weren't claimed. Absolutely right. Now, if I could just mention the second prong briefly, the second prong, because this is a mantra that you will hear again and again and again when you look at these briefs, that the changes that were made after the critical date based on this testing were not claims, were unclaimed features. This is just simply wrong, not only based on the preamble language Your Honor pointed out to, it is a fundamental claimed feature that calls for an alert envelope, first alert envelope, that is a function of a first severity of threat. And the district court found, after a lengthy review of the facts and extensive testimony, and again, if you have any doubt, this is in the appendix, at 177 to 79, particularly 179, the court had the benefit below. There were four sets of R&D design notes by HAPI for this system, one through four, by HAPI coincidence number three came two days before the critical date. The court reviewed that, all of the documents surrounding it, all the testimony, found that it reflected serious problems with the core claimed features of this case. And I'd be happy to elaborate, but this is all laid out in the court's opinion at 179, and at that page the court ties those problems that had not been solved as of the date directly to the claims, not subjective testimony. You'll see that again, the term subjective testimony used in the Sandell brief, eight times in seven pages. It was not the engineers, the inventors saying this is how I felt, it was the engineers saying this is what I did, this is what concrete changes we made, and how they related to the direct claims in this case. Mr. McCormick, after the George flight in March, were there any changes made to the system after the actual flight? Extensive changes, Your Honor, and just because you've got the date right, let me say that March is the George flight, July 29 is design notes three, that's two days before the critical date. Okay, the court finds, again, if you look at 177 to 179, that as of the critical date months after George, months after the George flight, was giving inverted warnings. Caution comes before the warning. It had a problem with what they call rapid descent. It had a problem with planes that approach, and the approach falls below the altitude of the aircraft. Serious problems, all of which changes had to be made not just after the George flight. They had to be made after the critical date several months later. The court found, and I'd be happy to review the evidence, that the George flight was not evidence that this was reduced to practice. It was evidence of the opposite. They said to George, we want to show you our old technology, which we've improved, downward looking, and, by the way, we'll show you some of the work we are doing on the new system. District Court made a factual finding that that represented not evidence that it had been reduced to practice. It represented the exact opposite, that the system was still in its infancy and had not been developed. Thank you, Mr. McCormick. Thank you, Your Honors. Our next case will be American Capital Corporation v. The United States.